PER CURIAM.
The sole issue in this appeal is whether the Houston Juvenile Court erred when it ordered that D.G., a three-year-old child, be returned to the custody of his mother, who resides in a home with his 13-year-old half brother, who had sodomized D.G.
In May 2003, D.G. was born to F.W.J., the mother, and B.J.G., the father. The mother and the father were not married. After D.G.’s birth, he resided with the mother. The father regularly exercised visitation with D.G. and voluntarily paid child support to the mother.
In February 2006, the father filed in the Houston Juvenile Court an emergency petition for custody of D.G. The father alleged that he was the putative father of D.G.; that he had voluntarily paid child support for D.G. since the child’s birth; that he had exercised weekend, holiday, and summer visitation with D.G.; that he had executed an “Affidavit of Paternity” as to his paternity of D.G.; that he was listed as D.G.’s father on D.G.’s birth certificate; and that D.G. bore the father’s last name. The father also alleged that D.G. resided in a home with the mother, several of D.G.’s half siblings, and the mother’s boyfriend (who she has since married). We note that D.G.’s half siblings included the 13-year-old half brother and two half sisters, who were 9 and 10 years old, respectively. D.G.’s half sisters did not reside with the mother; instead, they resided in Florida with their father, M.W., who was not the father of D.G.’s half brother. D.G.’s half sisters visited the mother and D.G. on a regular basis.
In his emergency petition, the father alleged that D.G.’s half brother had recently sodomized D.G., who was taken to a local hospital for treatment.[1] The father also alleged that the Houston County Department of Human Resources temporarily removed D.G. from the mother’s home following the incident, but that DHR then implemented a “safety plan,” pursuant to which the half brother and D.G. would reside together with the mother. The father asserted that he was married, that he had two stepchildren, and that he had “adequate housing and the ability to care for his child in order to prevent his child from being further subjected to sexual abuse.” The father requested that the juvenile court award him custody of D.G.
After the father filed his petition, the trial court immediately entered an order awarding the father pendente lite custody *857 of D.G. Thereafter, the juvenile court conducted the 72-hour hearing required by § 12-15-60, Ala.Code 1975, at which both the mother and the father testified. The juvenile court also apparently considered certain written reports from DHR, which included a proposed safety plan to return D.G. to the mother’s home. At the end of the hearing, the following colloquy occurred:
“THE COURT: I have a young man that’s thirteen with a father that’s somewhere in Mississippi who he alleges that he observed some type of sexual — had some type of sexual exposure with his father.[2]
“I have two little girls visiting in the home with another father.
“Then I have [D.G.’s] father who is a — I know nothing about except what’s been brought out on cross-examination today. So I need the report from his home, his home study on him.
“So then I have an unmarried, unrelated male in the home where the two little girls are visiting, where the little boy is going to be living.
“So Mr. Blumenfeld [counsel for DHR], DHR has got this child. You can make a placement where you think is best. I don’t think that the living arrangements and the safety plan are sufficient. You are going to have to go back to the drawing board because — and work something out.
“MR. BLUMENFELD: Are you specifically ordering us to remove that child, or are you saying you are giving— you are voicing your concerns?
“THE COURT: Yes. You are my agency to protect children. I’m giving you custody because I have got — I have got three different fathers, three sets of children in the home, and two sets of sexual abuse, two instances.[3]
“[FATHER’S ATTORNEY]: If I could point out that there is absolutely no sexual abuse or any allegations of anything on behalf of my client.
“THE COURT: I understand that. But I know nothing about him except what’s been brought out on his history. I cannot send the child in that direction at this time. I have to have a report from DHR and I’m going to give DHR custody.
“I’m going to declare the child dependent. You-all can take whatever steps you want to to protect that child. That’s your job.”
On the day that it conducted the 72-hour hearing, the trial court entered an order in which it adjudicated the father’s paternity of D.G., determined that D.G. was a dependent child, and transferred legal custody of D.G. to DHR. The court ordered DHR to investigate the father’s allegations, to report its findings to the court, and to perform home assessments on the father and the mother.
Two days after the entry of the 72-hour-hearing order, D.G.’s guardian ad li-tem filed a motion to intervene, alleging that DHR had “held an ISP and determined that the safety plan found insufficient by this court was in fact sufficient and the minor child should be placed in the home of the mother where the sexual misconduct occurred and the admitted perpetrator still resides.” The guardian ad litem requested that the trial court “intervene in the situation” to protect D.G. *858 and to avoid “the potential of harm” to D.G.
After the filing of the motion to intervene, the trial court immediately entered the following order on the case-action-summary sheet: “Upon [guardian ad litem’s] motion temporary custody returned to father. 72 hr. set 2-27-06 @ 10:00 A.M.”
The trial court held a hearing on February 27, 2006, but there is no indication in the record that it received additional testimony at that hearing. DHR apparently presented the trial court with an updated report on the mother and her boyfriend, whom the mother had married on February 24, 2006. After the hearing, the trial court entered an order that stated: “DHR to produce/provide background check on [C.J., the mother’s husband,] by 3-6-06. Father shall have visitation every other weekend and one week night.” Although the trial court did not address the issue of custody in its order, DHR’s report indicates that, as the guardian ad litem alleged in his motion, DHR placed D.G. in the mother’s care, subject to a safety plan.
In April 2006, the trial court conducted an ore tenus proceeding on the father’s petition for custody; only M.W. (the father of D.G.’s two half sisters) testified at the proceeding. The trial court thereafter entered an order declaring D.G. to be a dependent’ child and “[t]ransfer[ring] Legal Custody to joint custody with [the father] and [the mother].... Protective supervision order to be supervised by [DHR].... Primary residence with mother.”
The father appeals, contending that the trial court’s decision to return D.G. to the mother’s care, subject to DHR’s supervision, is not supported by the evidence. We agree.
The mother introduced no evidence at the April 2006 proceeding; the only evidence presented by the mother in this case was at the 72-hour hearing. We note that at the 72-hour hearing, the mother admitted that after the half brother sodomized D.G., the half brother informed her that his father had sexually abused him. The mother stated that she had suspected that D.G.’s half brother had been sexually abused and that D.G.’s half brother had been admitted to “Laurel Oakes” on four separate occasions, twice for treatment of “anger” issues, once because of an attempted suicide, and once for sexual abuse. The last admission to “Laurel Oakes” was after the half brother had sodomized D.G. The mother admitted that before the half brother sodomized D.G. she had taken the half brother to see a psychiatrist to address sexually deviant behavior. The mother affirmed that it “never crossed her mind” that she might need to make sure the half brother was not acting out against D.G. “because he loves his little brother and I knew he would never have done anything like that. In fact, he only performed that one time. He said it was an experiment.” The mother also admitted that she did not catch the half brother in the act of sodomizing D.G., but stated that the half brother had informed her that he sodomized D.G. The mother also admitted that the physician who examined D.G. told her he saw scar tissue, but she stated that the physician did not inform her whether scar tissue would be indicative of ongoing abusive behavior. When asked how scar tissue is created, the mother responded, “I don’t know, but [the half brother] would have told us if he had performed more than once.” The mother then admitted that the half brother had only recently informed her that his 10-year-old half sister had performed oral sex on him approximately two years before the father filed the emergency petition in February 2006. The half brother did not inform the mother of that alleged oral-sex incident until after *859 he had informed her that he had sodomized D.G. The mother noted that the 10-year-old half sister, who had been seeing a psychiatrist for approximately four years, denied that the oral-sex incident occurred.
As stated above, the only testimony the trial court received at the April 2006 proceeding was from M.W. No other evidence was formally admitted, although the record reflects that the trial court received some reports from DHR, including home studies on the mother’s home and on the father’s home. At the beginning of the trial, the court stated:
“[L]et me see if I can recite the facts as close as possible. The hospital found some evidence of sexual abuse. A safety plan was put into effect by DHR. And that safety plan is still in effect. And Family Options went into the home and they successfully completed Family Options.
“The father ... and his wife came into court and asked for an adjudication of paternity.... Paternity was adjudicated. And today we are here to resolve the custody issue.
“Since the last order, the father has had visitation every other weekend and Wednesdays.... So that is — I have a good report from both the father’s home and from the mother’s home as far as complying with the requirements that were set out after this incident occurred.
“However, [father’s counsel], you said you wanted to put on some testimony from [M.W.] who is ... the father of those two girls — that the safety plan is not being complied with.
“I thought we would take testimony as to whether the safety plan has been complied with, first.”
M.W. testified[4] that he had contacted DHR to discuss whether he should allow D.G.’s half sisters (i.e., his daughters) to visit with the mother while the half brother was residing in the mother’s home. M.W. stated that at one time he made sure that D.G.’s half brother was not spending the night in the home during visitation and that, on one occasion, he had kept D.G.’s half brother in Florida while his daughters visited in the mother’s home because he did not want them to be in the same home with the half brother. According to M.W., after the mother talked to M.W.’s wife, he contacted a DHR social worker concerning the visitation arrangement. The social worker informed him that a safety plan was in place and that his daughters “should be okay” if they visited with the mother. M.W. was told that the mother was supposed to sleep with D.G., that D.G.’s half brother was not to be left alone, and that there were “alarms of some kind ... if [the half brother] left his room.” M.W. was also told that the mother’s husband was supposed to sleep with D.G.’s half brother.
M.W. stated that after a recent visitation his daughters had informed him that the mother and her husband had slept in one bedroom, that D.G. had slept in another room with his half sisters, and that D.G.’s half brother had slept alone. M.W. testified that he believed his daughters were telling the truth about the sleeping arrangements, in part because they were excited about sleeping with D.G. and because they had made similar statements in the past when they were able to sleep with D.G. before the sodomy incident. M.W. admitted, however, that his daughters might not be telling the truth about the sleeping arrangements and that his oldest *860 daughter in particular had a problem with lying.
We note that M.W. has a master’s degree in psychology and counseling. According to M.W., his oldest daughter has behavior and mood problems, and she has been in counseling since she was six years old. M.W. stated that his oldest daughter’s counselors have not been able to determine the source of her problems, and the daughter “has been on different kinds of medications for years.” M.W. stated that he noticed that the older daughter was more aggressive toward the younger daughter when they returned to his home from visiting the mother. M.W. continued:
“Once we found out about the sexual abuse, her psychiatrist ... and her counselors, we then started figuring out maybe this is the missing piece we couldn’t figure out. Because, if you look up ... the signs and symptoms of a child that has been sexually abused, aggression is a problem, depression is a problem. She is on medication for depression. She is on medication to keep her from being aggressive. Which are all signs of being sexually abused.”
After M.W.’s testimony, the court again noted that it had “the reports in front of me. I have got both reports. They are good from both sides, really.” The father’s attorney then urged the trial court to award the father custody based on the child’s relationship with him and his wife and “in an abundance of caution and safety to make sure these abusive behaviors no longer affect [D.G.].” The mother’s attorney responded that the mother was D.G.’s primary caregiver, that the reports indicated that the mother had successfully followed the safety plan, and that “if there is a problem that comes up in the future, I truly believe that [the mother and her husband] will take the steps necessary to solve the problem, just like she did this time. I can put [the DHR social worker] on the stand, Judge, if you would like me to address this testimony.” The trial judge then responded, “I have read his report.”
After the mother’s attorney and the father’s attorney presented their initial arguments, the trial court requested DHR’s recommendation as to custody. DHR’s attorney stated that there were “two positive reports from our agency and Dale County [DHR, which had performed the home study on the father’s home]. We defer to the Court.” When the trial court requested a recommendation from D.G.’s guardian ad litem, he stated that, but for the evidence indicating that the mother might not be complying with the safety plan, he would have no concern about the child’s remaining in the mother’s care, “[b] ut ... without knowing more, I’m just saying that I can’t put as much credence on this safety plan as I could before.” Thereafter, the father’s attorney stated:
“There is only one way to eliminate the concerns of this Court and that is to place custody with my clients. That’s the only way to eliminate the concerns. Otherwise, we have a child who is placed back in a situation where everyone knows it’s been admitted that he is being abused. He is being molested sexually. The perpetrator is still in the house.
“All the safety plans in the world cannot account — for a sexual predator, two or three minutes is all they need. And there is no safety plan in the world that can guarantee that’s not going to happen.
“We are here and we know about it. We need to do something about it now. My client wants custody and that’s what we are arguing for.”
After the argument by the father’s attorney, the following colloquy occurred be *861 tween the mother’s attorney and the trial court:
“[MOTHER’S ATTORNEY]: We are prepared to put testimony on from [the mother and her husband] ... to dispute the testimony of [M.W.], and that is that they have never, never slept together in violation of this safety plan since it’s been put in place, regardless of what the girls may or may not have told [M.W.]. That is simply not the truth. They have spent the night together in the same bed on their honeymoon when no children were present at all, none of the children.
“So if the court sees fit, I will be glad to put the testimony up to dispute what [M.W.] testified to. But I would like to remind the Court that on April the 4th, at DHR’s direction, the minor child was taken for another physical examination at the hospital which revealed no evidence of molestation.”
“THE COURT: Okay. Thank you.
“It’s a difficult case. The child has been with his mother his whole life. And, you know, the mother reported the thing. Plus, she called the father. So the mother has done everything possible to rectify the situation. Family Options gave her a good report.
“So I’m going to give joint custody to both parties, just in case — so we won’t have to come back and we won’t have to comply with the [Ex parte] McLendon[, 455 So.2d 863 (Ala.1984),] standard.
“I’m going to let the primary residence remain with the mother, with DHR having protective supervision to keep an eye on this situation, and let the father have the continued visitation he has, and maybe work out some more visitation with the father so he can have more liberal visitation.
“So we are going to put the standard visitation that we have now in place and we can add some to that if you can work it out.
“Okay. We will get you a copy of the order.
“[DHR’S ATTORNEY]: Since we have protective supervision — we are not asking him to be a snitch — but assuming [M.W.] is going to allow visitation of the girls back with [the mother], we would certainly encourage him and I wish the Court would encourage him, any allegations or concerns — you know, this jurisdiction thing sounds great, but please let us know. The more eyes the better if you have concerns.
“THE COURT: You need to talk to [M.W.] about that. That’s not our decision today.”
The various reports that DHR supplied to the court reflect that in addition to sexually abusing D.G., D.G.’s half brother admitted that he had forced his 10-year-old half sister to perform oral sex on him approximately two years before the proceedings in this case. D.G.’s half brother suffers from “ADHD, Bi-polar, and Impulse control disorders and related behaviors.” He takes several medications, including “Adderall, Lexapro, Respradol, and Stratter,” and he has been “receiving medication management services [from a behavioral medicine physician] ... for approximately five years.”
The adolescent-sex-offender assessment that was performed on D.G.’s half brother states:
“1. [The half brother] needs to be involved in an outpatient sex offender program that will focus on providing him with appropriate sexual information. By participating in this program he should develop appropriate sexual behaviors and interaction skills. Also, an adult to prevent him from acting out on his inappropriate thought patterns should supervise him. Family therapy *862 should also be an integral part of his treatment program to ensure family and community safety.
“2. [The half brother] should be considered for involvement with the Juvenile Court System to ensure program compliance. Should any further inappropriate behaviors be displayed then he should be referred to a more restrictive setting.
“3. It is also essential that appropriate safety measures be implemented to prevent inappropriate behaviors. He should be monitored for inappropriate behaviors and appropriate measures taken to ensure his safety and the safety of everyone concerned.... At no time should he have contact with younger children and supervision is essential.
“... [T]he above-mentioned treatment recommendations must be maintained in order for [the half brother] to experience success and prevent sexual acting out behaviors.”
(Emphasis added.) The assessment was performed by a licensed marriage and family therapist who was “Board Certified in Sexual Abuse.”
Based in part on the therapist’s recommendations, DHR implemented the following safety plan:
“The family is currently participating in the Family Options Preservations program in an attempt to assist [the mother] in enhancing her parenting skills in order to be able to parent [D.G. and his half brother] safely, consistently, and more effectively. She will have a complete understanding of her protective role and the ability to create and articulate safety plans. Family Options will also monitor the ... family for any potential safety/risk factors in regard to [D.G.] until it can be determined whether [the half brother] needs inpatient or outpatient services. [The mother] has agreed to a safety plan in which [the half brother] and [D.G.] are to be provided with constant supervision by a responsible adult at all times. [The half brother and D.G.] are not allowed to sleep in the same bedroom together. [The mother] will sleep with (in the same bedroom as) [D.G.] This safety plan also applied to [D.G.’s half sisters] when they visit every other weekend. They are not to be left unsupervised nor are they allowed to share a bedroom with [the half brother], [The mother] will continue to sleep in the same bedroom as [D.G.] at night. [The mother’s husband] will sleep in the same room as [the half brother] while [the mother] sleeps with [D.G. and his half sisters] during their visitation every other weekend. [The mother] will report to this worker and/or ... [the therapist who examined the half brother] ... if [the half brother] should display any suicidal behavior and/or any sexual inappropriate behavior such as in viewing pornography, sexual contact with others, engaging] in masturbation, or makfing] any sexual inappropriate comments.”
DHR concluded that the mother was committed to her children’s safety and, in addition to the safety measures discussed above, it “placed alarms (motion detectors) in the household in order to make sure [D.G.] is safe at night. The alarms have been installed in [D.G.’s] and [the half brother’s] bedrooms as an additional safety precaution in order to assure [D.G.’s] safety.”
DHR’s reports reflect that the mother is a recovering alcoholic and that her husband “has an extensive criminal record,” including
“two DUI alcohol misdemeanor arrests, a marijuana possession [second degree], unlawful distribution of a controlled substance, and unlawful possession and *863 receiving a controlled substance. The unlawful possession and receiving a controlled substance was [the husband’s] most recent it was on October 25, 2002. This charge was also a probation violation. [The husband] reportedly is not on probation. [The husband] is currently in recovery and attends narcotics anonymous meetings weekly. He reports that he as been sober for three and a half years.”
DHR administered a drug screen to the mother’s husband on March 3, 2006; the screen reflected a negative result for the presence of “any illegal or controlled substances.” DHR’s report also reflects that the mother is employed full-time and that D.G. attends a day-care facility while she is at work. DHR concluded that D.G. was “very attached” to the mother and that he was “being provided with a safe and structured home environment” in the mother’s home.
Like the mother’s husband, the father is a recovering illegal drug user. The father, who admitted that he had used marijuana as recently as three months before the first 72-hour hearing, was “in recovery and he attends Narcotics Anonymous meetings regularly.” A random drug screen that DHR administered to the father in February 2006 was “negative for any illegal or controlled substances.” The father also was arrested for domestic violence in August 2000, after he discovered that a “young woman that he was married to for one year, received divorce papers. He said that he was unaware that she was not legally divorced. He said that he became upset with her lies and cheating.” There is no evidence of what “domestic violence” might have occurred on that occasion and there is no evidence indicating that any children were involved in or affected by the incident.
The father is married. Both the father- and his wife are employed. The father’s wife “works 3 days and is off 4 days.” According to the home study on the father, the father’s wife “was arrested for a DUI in 10-1997” and “she was also arrested in 1997 for solicitation. She explained that she was in the wrong place at the wrong time.” The father’s wife has two sons, who were six years old and three years old at the time of these proceedings. The father has provided child support for D.G. and has exercised visitation with D.G. throughout D.G.’s life. D.G. refers to the father’s wife as “mommy.” Drug screens conducted on the father and his wife a few days before these proceedings reflected a negative result for the presence of the drugs screened for. Based on its investigation, Dale County DHR recommended that D.G. be placed in the father’s home.
As our Supreme Court recently stated in Fadalla v. Fadalla, 929 So.2d 429, 433 (Ala.2005),
“ ‘[W]hen a trial court hears ore tenus testimony, its findings on disputed facts are presumed correct and its judgment based on those findings will not be reversed unless the judgment is palpably erroneous or manifestly unjust.’ Philpot v. State, 843 So.2d 122, 125 (Ala.2002). ‘ “The presumption of correctness, however, is rebuttable and may be overcome where there is insufficient evidence presented to the trial court to sustain its judgment.” ’ Wattman v. Rowell, 913 So.2d 1083, 1086 (Ala.2005) (quoting Dennis v. Dobbs, 474 So.2d 77, 79 (Ala.1985)). ‘Additionally, the ore tenus rule does not extend to cloak with a presumption of correctness a trial judge’s conclusions of law or the incorrect application of law to the facts.’ Id.”
We also note that the trial court was charged with making the custody disposi *864 tion that was in D.G.’s best interests. See Ala.Code 1975, § 12-15-71(a).
The trial court’s comments reflect that it believed that both the mother’s home and the father’s home were appropriate for D.G. The trial court relied on the mother’s status as having been D.G.’s primary caregiver and her willingness to follow DHR’s safety plan as the basis for awarding her, instead of the father, physical custody of D.G. subject to DHR’s supervision. See Ala.Code 1975, § 12-15-71(a)(2). These factors, however, are not sufficient to support the trial court’s judgment because they do not, of themselves, adequately address the danger posed to D.G. when he is residing in the mother’s home.
Considering the record as a whole, there is one glaring, undisputed fact: the parties, their attorneys, the therapist, DHR’s personnel, and the guardian ad litem all understood that there was some risk of a recurrence of the half brother’s behavior if D.G. remains in the mother’s home. By contrast, there is no evidence that D.G. is at risk in any way in the father’s home. In particular, we note that although the DHR reports make reference to several of the recommendations from the therapist who prepared the sex-offender assessment on the half brother, the reports make no reference to the therapist’s recommendation that “[a]t no time should [the half brother] have contact with younger children.” Also, there is no evidence indicating that the therapist who prepared the sex-offender assessment approved of DHR’s plan to place the half brother in the same home with D.G., where the half brother would have regular contact with D.G., a young child. Likewise, we note that there was no evidence indicating that D.G. would be adversely affected if he was placed in the father’s care, particularly in light of the father’s having exercised regular visitation with D.G. and the positive relationship that exists between D.G. and the father’s wife. Although some disruptive effect would no doubt result from placing D.G. in the father’s home rather than in the mother’s home, that effect could be minimized through an appropriate visitation arrangement that does not expose D.G. to a constant, daily risk of being sexually abused by his unstable half brother.
The trial court concluded that it was in D.G.’s best interest to be returned to a home where he would consistently be in the presence of someone with an impulse-control disorder who had sexually abused him, despite the existence of an alternative-parental placement where that risk was not present. In light of the devastating consequences that sexual abuse has on a child, the undisputed risk that the half brother poses to D.G., and the positive, established relationship that the father has with D.G., we must conclude that the evidence does not support the trial court’s judgment.
In light of the foregoing, the trial court’s judgment is due to be reversed and this cause remanded for the entry of a judgment consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, MURDOCK, and BRYAN, JJ., concur.
PITTMAN, J., concurs in the result, without writing.
CRAWLEY, P.J., dissents, with writing.

. According to a report from the Department of Human Resources, D.G.'s half brother stated that he "stuck [his] thing in [D.G.’s] butt.” A hospital emergency-room evaluation of D.G. when he was taken there for treatment indicated that D.G. had "some abrasions and redness in his rectal area.”

. The mother testified that the half brother informed her that he had been sexually abused by his father.

. In addition to sodomizing D.G., the half brother allegedly sexually molested his 10-year-old half sister while she was visiting with the mother.

. Although much of M.W.'s testimony was based on hearsay, hearsay evidence is admissible in the dispositional phase of a dependency proceeding. See Ala.Code 1975, § 12 — 15— 65(h); P.M.L. v. D.T.P., 631 So.2d 1042, 1043 (Ala.Civ.App.1993).